# FORT GRATIOT SANITARY LANDFILL, INC. *v.* MICHIGAN DEPARTMENT OF NATURAL RESOURCES ET AL.

No. 91–636.   Argued March 30, 1992—Decided June 1, 1992

354

STEVENS, J., delivered the opinion of the Court, in which WHITE, O'CON-NOR, SCALIA, KENNEDY, SOUTER, and THOMAS, JJ., joined. REHNQUIST, C. J., filed a dissenting opinion, in which BLACKMUN, J., joined, *post,* p. 368.

*Harold B. Finn III* argued the cause for petitioner. With him on the briefs were *Donna Nelson Heller* and *David I. Albin.*

*Thomas L. Casey,* Assistant Solicitor General of Michigan, argued the cause for respondents. With him on the brief for the state respondents were *Frank J. Kelley,* Attorney General, *Gay Secor Hardy,* Solicitor General, and *Thomas J. Emery* and *James E. Riley,* Assistant Attorneys General. *Lawrence R. Ternan, Margaret Battle Kiernan,* and *Robert J. Nickerson* filed a brief for the county respondents.*

---

*\*Andrew J. Pincus, Evan M. Tager,* and *Bruce J. Parker* filed a brief for the National Solid Wastes Management Association as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the State of Alabama et al. by *Chris Gorman,* Attorney General of Kentucky, and

JUSTICE STEVENS delivered the opinion of the Court.

In *Philadelphia* v. *New Jersey*, 437 U. S. 617, 618 (1978), we held that a New Jersey law prohibiting the importation of most "'solid or liquid waste which originated or was collected outside the territorial limits of the State'" violated the Commerce Clause of the United States Constitution. In this case petitioner challenges a Michigan law that prohibits private landfill operators from accepting solid waste that originates outside the county in which their facilities are located. Adhering to our holding in the *New Jersey* case, we conclude that this Michigan statute is also unconstitutional.

## I

In 1978, Michigan enacted its Solid Waste Management Act[1] (SWMA). That Act required every Michigan county to estimate the amount of solid waste that would be generated in the county in the next 20 years and to adopt a plan providing for its disposal at facilities that comply with state health standards. Mich. Comp. Laws § 299.425 (Supp. 1991).

---

*Robert V. Bullock* and *Stan Cox*, Assistant Attorneys General, *James H. Evans*, Attorney General of Alabama, *Grant Woods*, Attorney General of Arizona, *Charles M. Oberly III*, Attorney General of Delaware, *Linley E. Pearson*, Attorney General of Indiana, *Charles S. Crookham*, Attorney General of Oregon, and *Mary Sue Terry*, Attorney General of Virginia; and for Whatcom County, Washington, by *Paul J. Kundtz.*

A brief of *amici curiae* was filed for the Commonwealth of Pennsylvania et al. by *Ernest D. Preate, Jr.*, Attorney General of Pennsylvania, *Calvin R. Koons*, Senior Deputy Attorney General, *John G. Knorr III*, Chief Deputy Attorney General, *Gail B. Phelps*, and *David H. Wersan*, and by the Attorneys General for their respective States as follows: *Michael J. Bowers* of Georgia, *Larry EchoHawk* of Idaho, *Roland W. Burris* of Illinois, *Marc Racicot* of Montana, *Don Stenberg* of Nebraska, *Frankie Sue Del Papa* of Nevada, *Nicholas Spaeth* of North Dakota, *Tom Udall* of New Mexico, *Lee Fisher* of Ohio, *T. Travis Medlock* of South Carolina, *Mark Barnett* of South Dakota, *Charles W. Burson* of Tennessee, *Mario J. Palumbo* of West Virginia, and *Joseph B. Meyer* of Wyoming.

[1] 1978 Mich. Pub. Acts, No. 641, codified as amended, Mich. Comp. Laws §§ 299.401–299.437 (1984 ed. and Supp. 1991).

After holding public hearings and obtaining the necessary approval of municipalities in the county, as well as the approval of the Director of the Michigan Department of Natural Resources, the County Board of Commissioners adopted a solid waste management plan for St. Clair County. In 1987, the Michigan Department of Natural Resources issued a permit to petitioner to operate a sanitary landfill as a solid waste[2] disposal area in St. Clair County. See *Bill Kettlewell Excavating, Inc.* v. *Michigan Dept. of Natural Resources*, 931 F. 2d 413, 414 (CA6 1991).

On December 28, 1988, the Michigan Legislature amended the SWMA by adopting two provisions concerning the "acceptance of waste or ash generated outside the county of disposal area." See 1988 Mich. Pub. Acts, No. 475, § 1, codified as amended, Mich. Comp. Laws §§ 299.413a, 299.430(2)

---

[2] The Michigan statute defines solid waste as follows:

"Sec. 7. (1) 'Solid waste' means garbage, rubbish, ashes, incinerator ash, incinerator residue, street cleanings, municipal and industrial sludges, solid commercial and solid industrial waste, and animal waste other than organic waste generated in the production of livestock and poultry. Solid waste does not include the following:

"(a) Human body waste.

"(b) Organic waste generated in the production of livestock and poultry.

"(c) Liquid waste.

"(d) Ferrous or nonferrous scrap directed to a scrap metal processor or to a reuser of ferrous or nonferrous products.

"(e) Slag or slag products directed to a slag processor or to a reuser of slag or slag products.

"(f) Sludges and ashes managed as recycled or nondetrimental materials appropriate for agricultural or silvicultural use pursuant to a plan approved by the director.

"(g) Materials approved for emergency disposal by the director.

"(h) Source separated materials.

"(i) Site separated materials.

"(j) Fly ash or any other ash produced from the combustion of coal, when used in the following instances . . .

"(k) Other wastes regulated by statute." Mich. Comp. Laws § 299.407(7) (Supp. 1991).

(Supp. 1991). Those amendments (Waste Import Restrictions), which became effective immediately, provide:

"A person shall not accept for disposal solid waste . . . that is not generated in the county in which the disposal area is located unless the acceptance of solid waste . . . that is not generated in the county is explicitly authorized in the approved county solid waste management plan." § 299.413a.

"In order for a disposal area to serve the disposal needs of another county, state, or country, the service . . . must be explicitly authorized in the approved solid waste management plan of the receiving county." § 299.430(2).

In February 1989, petitioner submitted an application to the St. Clair County Solid Waste Planning Committee for authority to accept up to 1,750 tons per day of out-of-state waste at its landfill. See *Bill Kettlewell Excavating, Inc.* v. *Michigan Dept. of Natural Resources*, 732 F. Supp. 761, 762 (ED Mich. 1990). In that application petitioner promised to reserve sufficient capacity to dispose of all solid waste generated in the county in the next 20 years. The planning committee denied the application. *Ibid.* In view of the fact that the county's management plan does not authorize the acceptance of any out-of-county waste, the Waste Import Restrictions in the 1988 statute effectively prevent petitioner from receiving any solid waste that does not originate in St. Clair County.

Petitioner therefore commenced this action seeking a judgment declaring the Waste Import Restrictions unconstitutional and enjoining their enforcement. Petitioner contended that requiring a private landfill operator to limit its business to the acceptance of local waste constituted impermissible discrimination against interstate commerce. The District Court denied petitioner's motion for summary judgment, however, *id.*, at 766, and subsequently dismissed the complaint, App. 4. The court first concluded that the statute

does not discriminate against interstate commerce "on its face" because the import restrictions apply "equally to Michigan counties outside of the county adopting the plan as well as to out-of-state entities." 732 F. Supp., at 764. It also concluded that there was no discrimination "in practical effect" because each county was given discretion to accept out-of-state waste. *Ibid.* Moreover, the incidental effect on interstate commerce was "not clearly excessive in relation to the [public health and environmental] benefits derived by Michigan from the statute." *Id.*, at 765.

The Court of Appeals for the Sixth Circuit agreed with the District Court's analysis. Although it recognized that the statute "places in-county and out-of-county waste in separate categories," the Court of Appeals found no discrimination against interstate commerce because the statute "does not treat out-of-county waste from Michigan any differently than waste from other states." 931 F. 2d, at 417. It also agreed that there was no actual discrimination because petitioner had not alleged that all counties in Michigan ban out-of-state waste. *Id.*, at 418. Accordingly, it affirmed the judgment of the District Court. *Ibid.* We granted certiorari, 502 U. S. 1024 (1992), because of concern that the decision below was inconsistent with *Philadelphia* v. *New Jersey* and now reverse.

## II

Before discussing the rather narrow issue that is contested, it is appropriate to identify certain matters that are not in dispute. Michigan's comprehensive program of regulating the collection, transportation, and disposal of solid waste, as it was enacted in 1978 and administered prior to the 1988 Waste Import Restrictions, is not challenged. No issue relating to hazardous waste is presented, and there is no claim that petitioner's operation violated any health, safety, or sanitation requirement. Nor does the case raise any question concerning policies that municipalities or other governmental agencies may pursue in the management of

publicly owned facilities. The case involves only the validity of the Waste Import Restrictions as they apply to privately owned and operated landfills.

On the other hand, *Philadelphia* v. *New Jersey* provides the framework for our analysis of this case. Solid waste, even if it has no value, is an article of commerce.[3] 437 U. S., at 622–623. Whether the business arrangements between out-of-state generators of waste and the Michigan operator of a waste disposal site are viewed as "sales" of garbage or "purchases" of transportation and disposal services, the commercial transactions unquestionably have an interstate character. The Commerce Clause thus imposes some constraints on Michigan's ability to regulate these transactions.

As we have long recognized, the "negative" or "dormant" aspect of the Commerce Clause prohibits States from "advanc[ing] their own commercial interests by curtailing the movement of articles of commerce, either into or out of the state." *H. P. Hood & Sons, Inc.* v. *Du Mond*, 336 U. S. 525, 535 (1949). A state statute that clearly discriminates against interstate commerce is therefore unconstitutional "unless the discrimination is demonstrably justified by a valid factor unrelated to economic protectionism." *New Energy Co. of Ind.* v. *Limbach*, 486 U. S. 269, 274 (1988).

---

[3] As we explained in *Philadelphia* v. *New Jersey:*

"All objects of interstate trade merit Commerce Clause protection; none is excluded by definition at the outset. In *Bowman* [v. *Chicago & Northwestern R. Co.*, 125 U. S. 465 (1888),] and similar cases, the Court held simply that because the articles' worth in interstate commerce was far outweighed by the dangers inhering in their very movement, States could prohibit their transportation across state lines. Hence, we reject the state court's suggestion that the banning of 'valueless' out-of-state wastes by ch. 363 implicates no constitutional protection. Just as Congress has power to regulate the interstate movement of these wastes, States are not free from constitutional scrutiny when they restrict that movement. Cf. *Hughes* v. *Alexandria Scrap Corp.*, 426 U. S. 794, 802–814; *Meat Drivers* v. *United States*, 371 U. S. 94." 437 U. S., at 622–623.

New Jersey's prohibition on the importation of solid waste failed this test:

> "[T]he evil of protectionism can reside in legislative means as well as legislative ends. Thus, it does not matter whether the ultimate aim of ch. 363 is to reduce the waste disposal costs of New Jersey residents or to save remaining open lands from pollution, for we assume New Jersey has every right to protect its residents' pocketbooks as well as their environment. And it may be assumed as well that New Jersey may pursue those ends by slowing the flow of *all* waste into the State's remaining landfills, even though interstate commerce may incidentally be affected. But whatever New Jersey's ultimate purpose, it may not be accompanied by discriminating against articles of commerce coming from outside the State unless there is some reason, apart from their origin, to treat them differently. Both on its face and in its plain effect, ch. 363 violates this principle of nondiscrimination.
>
> "The Court has consistently found parochial legislation of this kind to be constitutionally invalid, whether the ultimate aim of the legislation was to assure a steady supply of milk by erecting barriers to allegedly ruinous outside competition, *Baldwin* v. *G. A. F. Seelig, Inc.*, 294 U. S., at 522–524; or to create jobs by keeping industry within the State, *Foster-Fountain Packing Co.* v. *Haydel*, 278 U. S. 1, 10; *Johnson* v. *Haydel*, 278 U. S. 16; *Toomer* v. *Witsell*, 334 U. S., at 403–404; or to preserve the State's financial resources from depletion by fencing out indigent immigrants, *Edwards* v. *California*, 314 U. S. 160, 173–174. In each of these cases, a presumably legitimate goal was sought to be achieved by the illegitimate means of isolating the State from the national economy." *Philadelphia* v. *New Jersey*, 437 U. S., at 626–627.

The Waste Import Restrictions enacted by Michigan authorize each of the State's 83 counties to isolate itself from the national economy. Indeed, unless a county acts affirmatively to permit other waste to enter its jurisdiction, the statute affords local waste producers complete protection from competition from out-of-state waste producers who seek to use local waste disposal areas. In view of the fact that Michigan has not identified any reason, apart from its origin, why solid waste coming from outside the county should be treated differently from solid waste within the county, the foregoing reasoning would appear to control the disposition of this case.

## III

Respondents Michigan and St. Clair County argue, however, that the Waste Import Restrictions—unlike the New Jersey prohibition on the importation of solid waste—do not discriminate against interstate commerce on their face or in effect because they treat waste from other Michigan counties no differently than waste from other States. Instead, respondents maintain, the statute regulates evenhandedly to effectuate local interests and should be upheld because the burden on interstate commerce is not clearly excessive in relation to the local benefits. Cf. *Pike* v. *Bruce Church, Inc.,* 397 U. S. 137, 142 (1970). We disagree, for our prior cases teach that a State (or one of its political subdivisions) may not avoid the strictures of the Commerce Clause by curtailing the movement of articles of commerce through subdivisions of the State, rather than through the State itself.

In *Brimmer* v. *Rebman,* 138 U. S. 78 (1891), we reviewed the constitutionality of a Virginia statute that imposed special inspection fees on meat from animals that had been slaughtered more than 100 miles from the place of sale. We concluded that the statute violated the Commerce Clause even though it burdened Virginia producers as well as the Illinois litigant before the Court. We explained:

"[T]his statute [cannot] be brought into harmony with the Constitution by the circumstance that it purports to apply alike to the citizens of all the States, including Virginia; for, 'a burden imposed by a State upon interstate commerce is not to be sustained simply because the statute imposing it applies alike to the people of all the States, including the people of the State enacting such statute.' *Minnesota* v. *Barber*, [136 U. S. 313 (1890)]; *Robbins* v. *Shelby Taxing District*, 120 U. S. 489, 497. If the object of Virginia had been to obstruct the bringing into that State, for use as human food, of all beef, veal and mutton, however wholesome, from animals slaughtered in distant States, that object will be accomplished if the statute before us be enforced." *Id.*, at 82–83.

In *Dean Milk Co.* v. *Madison*, 340 U. S. 349 (1951), another Illinois litigant challenged a city ordinance that made it unlawful to sell any milk as pasteurized unless it had been processed at a plant "within a radius of five miles from the central square of Madison," *id.*, at 350. We held the ordinance invalid, explaining:

"[T]his regulation, like the provision invalidated in *Baldwin* v. *Seelig, Inc.*, [294 U. S. 511 (1935)], in practical effect excludes from distribution in Madison wholesome milk produced and pasteurized in Illinois. 'The importer . . . may keep his milk or drink it, but sell it he may not.' *Id.*, at 521. In thus erecting an economic barrier protecting a major local industry against competition from without the State, Madison plainly discriminates against interstate commerce." *Id.*, at 354.

The fact that the ordinance also discriminated against all Wisconsin producers whose facilities were more than five miles from the center of the city did not mitigate its burden on interstate commerce. As we noted, it was "immaterial that Wisconsin milk from outside the Madison area is sub-

jected to the same proscription as that moving in interstate commerce." *Id.*, at 354, n. 4.

Nor does the fact that the Michigan statute allows individual counties to accept solid waste from out of state qualify its discriminatory character. In the *New Jersey* case the statute authorized a state agency to promulgate regulations permitting certain categories of waste to enter the State. See 437 U. S., at 618–619. The limited exception covered by those regulations—like the fact that several Michigan counties accept out-of-state waste—merely reduced the scope of the discrimination; for all categories of waste not excepted by the regulations, the discriminatory ban remained in place. Similarly, in this case St. Clair County's total ban on out-of-state waste is unaffected by the fact that some other counties have adopted a different policy.[4]

In short, neither the fact that the Michigan statute purports to regulate intercounty commerce in waste nor the fact that some Michigan counties accept out-of-state waste provides an adequate basis for distinguishing this case from *Philadelphia* v. *New Jersey.*

## IV

Michigan and St. Clair County also argue that this case is different from *Philadelphia* v. *New Jersey* because the SWMA constitutes a comprehensive health and safety regulation rather than "economic protectionism" of the State's limited landfill capacity. Relying on an excerpt from our opinion in *Sporhase* v. *Nebraska ex rel. Douglas,* 458 U. S.

---

[4] Cf. *Wyoming* v. *Oklahoma,* 502 U. S. 437, 455 (1992) (Oklahoma statute that "expressly reserves a segment of the Oklahoma coal market for Oklahoma-mined coal, to the exclusion of . . . other States," violates the Commerce Clause even though it "sets aside only a 'small portion' of the Oklahoma coal market . . . . The volume of commerce affected measures only the *extent* of the discrimination; it is of no relevance to the determination whether a State has discriminated against interstate commerce") (emphasis in original).

941 (1982), they contend that the differential treatment of out-of-state waste is reasonable because they have taken measures to conserve their landfill capacity and the SWMA is necessary to protect the health of their citizens. That reliance is misplaced. In the *Sporhase* case we considered the constitutionality of a Nebraska statute that prohibited the withdrawal of ground water for use in an adjoining State without a permit that could only issue if four conditions were satisfied.[5] We held that the fourth condition—a requirement that the adjoining State grant reciprocal rights to withdraw its water and allow its use in Nebraska—violated the Commerce Clause. *Id.*, at 957–958.

As a preface to that holding, we identified several reasons that, in combination, justified the conclusion that the other conditions were facially valid. *Id.*, at 957. First, we questioned whether the statute actually discriminated against interstate commerce. Although the restrictive conditions in the statute nominally applied only to interstate transfers of ground water, they might have been "no more strict in application than [other state-law] limitations upon intrastate transfers." *Id.*, at 956. "Obviously, a State that imposes severe withdrawal and use restrictions on its own citizens is not discriminating against interstate commerce when it

---

[5] The statute at issue in *Sporhase* v. *Nebraska ex rel. Douglas* provided: "'Any person, firm, city, village, municipal corporation or any other entity intending to withdraw ground water from any well or pit located in the State of Nebraska and transport it for use in an adjoining state shall apply to the Department of Water Resources for a permit to do so. If the Director of Water Resources finds that the withdrawal of the ground water requested is reasonable, is not contrary to the conservation and use of ground water, and is not otherwise detrimental to the public welfare, he shall grant the permit if the state in which the water is to be used grants reciprocal rights to withdraw and transport ground water from that state for use in the State of Nebraska.'" 458 U. S., at 944 (quoting Neb. Rev. Stat. § 46–613.01 (1978)).

seeks to prevent the uncontrolled transfer of water out of the State." *Id.*, at 955–956.

We further explained that a confluence of factors could justify a State's efforts to conserve and preserve ground water for its own citizens in times of severe shortage.[6] Only the first of those reasons—our reference to the well-recognized

---

[6] "Moreover, in the absence of a contrary view expressed by Congress, we are reluctant to condemn as unreasonable, measures taken by a State to conserve and preserve for its own citizens this vital resource in times of severe shortage. Our reluctance stems from the 'confluence of [several] realities.' *Hicklin* v. *Orbeck*, 437 U. S. 518, 534 (1978). First, a State's power to regulate the use of water in times and places of shortage for the purpose of protecting the health of its citizens—and not simply the health of its economy—is at the core of its police power. For Commerce Clause purposes, we have long recognized a difference between economic protectionism, on the one hand, and health and safety regulation, on the other. See *H. P. Hood & Sons, Inc.* v. *Du Mond*, 336 U. S. 525, 533 (1949). Second, the legal expectation that under certain circumstances each State may restrict water within its borders has been fostered over the years not only by our equitable apportionment decrees, see, *e. g.*, *Wyoming* v. *Colorado*, 353 U. S. 953 (1957), but also by the negotiation and enforcement of interstate compacts. Our law therefore has recognized the relevance of state boundaries in the allocation of scarce water resources. Third, although appellee's claim to public ownership of Nebraska ground water cannot justify a total denial of federal regulatory power, it may support a limited preference for its own citizens in the utilization of the resource. See *Hicklin* v. *Orbeck, supra*, at 533–534. In this regard, it is relevant that appellee's claim is logically more substantial than claims to public ownership of other natural resources. See *supra*, at 950–951. Finally, given appellee's conservation efforts, the continuing availability of ground water in Nebraska is not simply happenstance; the natural resource has some indicia of a good publicly produced and owned in which a State may favor its own citizens in times of shortage. See *Reeves, Inc.* v. *Stake*, 447 U. S. 429 (1980); cf. *Philadelphia* v. *New Jersey*, 437 U. S., at 627–628, and n. 6; *Baldwin* v. *Fish and Game Comm'n of Montana*, 436 U. S. 371 (1978). A facial examination of the first three conditions set forth in § 46–613.01 does not, therefore, indicate that they impermissibly burden interstate commerce. Appellants, indeed, seem to concede their reasonableness." *Sporhase* v. *Nebraska ex rel. Douglas*, 458 U. S., at 956–957.

difference between economic protectionism, on the one hand, and health and safety regulation, on the other—is even arguably relevant to this case.[7] We may assume that all of the provisions of Michigan's SWMA prior to the 1988 amendments adding the Waste Import Restrictions could fairly be characterized as health and safety regulations with no protectionist purpose, but we cannot make that same assumption with respect to the Waste Import Restrictions themselves. Because those provisions unambiguously discriminate against interstate commerce, the State bears the burden of proving that they further health and safety concerns that cannot be adequately served by nondiscriminatory alternatives. Michigan and St. Clair County have not met this burden.[8]

Michigan and St. Clair County assert that the Waste Import Restrictions are necessary because they enable individual counties to make adequate plans for the safe disposal of future waste.[9] Although accurate forecasts about the vol-

---

[7] The other reasons were related to the special role that States have traditionally played in the ownership and control of ground water and to the fact that Nebraska's conservation efforts had given the water some indicia of a good that is publicly produced and owned. See *id.*, at 956. There are, however, no analogous traditional legal expectations regarding state regulation of private landfills, which are neither publicly produced nor publicly owned.

[8] The dissent states that we should remand for further proceedings in which Michigan and St. Clair County might be able to prove that the Waste Import Restrictions constitute legitimate health and safety regulations, rather than economic protectionism of the State's limited landfill capacity. See *post*, at 368, 371. We disagree, for respondents have neither asked for such a remand nor suggested that, if given the opportunity, they could prove that the restrictions further health and safety concerns that cannot adequately be served by nondiscriminatory alternatives.

[9] "An unregulated free market flow of waste into Michigan," the State asserts, "would be disruptive of efforts to plan for the proper disposal of future waste due to incoming waste from sources not accounted for during the planning process." Brief for State Respondents 49; see also Brief for County Respondents 13.

ume and composition of future waste flows may be an indispensable part of a comprehensive waste disposal plan, Michigan could attain that objective without discriminating between in- and out-of-state waste. Michigan could, for example, limit the amount of waste that landfill operators may accept each year. See *Philadelphia* v. *New Jersey*, 437 U. S., at 626. There is, however, no valid health and safety reason for limiting the amount of waste that a landfill operator may accept from outside the State, but not the amount that the operator may accept from inside the State.

Of course, our conclusion would be different if the imported waste raised health or other concerns not presented by Michigan waste. In *Maine* v. *Taylor*, 477 U. S. 131 (1986), for example, we upheld the State's prohibition against the importation of live baitfish because parasites and other characteristics of nonnative species posed a serious threat to native fish that could not be avoided by available inspection techniques. We concluded:

> "The evidence in this case amply supports the District Court's findings that Maine's ban on the importation of live baitfish serves legitimate local purposes that could not adequately be served by available nondiscriminatory alternatives. This is not a case of arbitrary discrimination against interstate commerce; the record suggests that Maine has legitimate reasons, 'apart from their origin, to treat [out-of-state baitfish] differently,' *Philadelphia* v. *New Jersey*, 437 U. S., at 627." *Id.*, at 151–152.

In this case, in contrast, the lower courts did not find—and respondents have not provided—any legitimate reason for allowing petitioner to accept waste from inside the county but not waste from outside the county.

For the foregoing reasons, the Waste Import Restrictions unambiguously discriminate against interstate commerce and are appropriately characterized as protectionist measures that cannot withstand scrutiny under the Commerce

Clause. The judgment of the Court of Appeals is therefore reversed.

*It is so ordered.*

CHIEF JUSTICE REHNQUIST, with whom JUSTICE BLACKMUN joins, dissenting.

When confronted with a dormant Commerce Clause challenge "[t]he crucial inquiry . . . must be directed to determining whether [the challenged statute] is basically a protectionist measure, or whether it can fairly be viewed as a law directed to legitimate local concerns, with effects upon interstate commerce that are only incidental." *Philadelphia* v. *New Jersey*, 437 U. S. 617, 624 (1978). Because I think the Michigan statute is at least arguably directed to legitimate local concerns, rather than improper economic protectionism, I would remand this case for further proceedings.

The substantial environmental, esthetic, health, and safety problems flowing from this country's waste piles were already apparent at the time we decided *Philadelphia.* Those problems have only risen in the intervening years. Salisbury, Pollution Liability Insurance Coverage, The Standard-Form Pollution Exclusion, and the Insurance Industry: A Case Study in Collective Amnesia, 21 Envtl. L. 357, 369–370 (1991). In part this is due to increased waste volumes, volumes that are expected to continue rising for the foreseeable future. See United States Environmental Protection Agency, Characterization of Municipal Solid Waste in the United States: 1990 Update 10 (municipal solid wastes have increased from 128.1 million tons in 1975 to 179.6 million tons in 1988, expected to rise to 216 million tons by the year 2000); *id.,* at ES–3 (1988 waste was the equivalent of 4.0 pounds per person per day, expected to rise to 4.4 pounds per person by the year 2000). In part it is due to exhaustion of existing capacity. *Id.,* at 55 (landfill disposals increased from 99.7 million tons in 1975 to 130.5 million in 1988); 56 Fed. Reg. 50980 (1991) (45% of solid waste landfills expected to reach

capacity by 1991). It is no secret why capacity is not expanding sufficiently to meet demand—the substantial risks attendant to waste sites make them extraordinarily unattractive neighbors. *Swin Resource Systems, Inc.* v. *Lycoming Cty.*, 883 F. 2d 245, 253 (CA3 1989), cert. denied, 493 U. S. 1077 (1990). The result, of course, is that while many are willing to generate waste—indeed, it is a practical impossibility to solve the waste problem by banning waste production—few are willing to help dispose of it. Those locales that do provide disposal capacity to serve foreign waste effectively are affording reduced environmental and safety risks to the States that will not take charge of their own waste.*

The State of Michigan has stepped into this quagmire in order to address waste problems generated by its own populace. It has done so by adopting a comprehensive approach to the disposal of solid wastes generated within its borders. The legislation challenged today is simply one part of a broad package that includes a number of features: a state-mandated statewide effort to control and plan for waste disposal, Mich. Comp. Laws §§ 299.427 and 299.430 (1984 and Supp. 1991), requirements that local units of government participate in the planning process, *ibid.*, and § 299.426 (Supp. 1991), restrictions to assure safe transport, § 299.431 (1984), a ban on the operation of waste disposal facilities unless various design and technical requirements are satisfied and appropriate permits obtained, *ibid.*, and § 299.432a (Supp. 1991), and commitments to promote source separation, composting, and recycling, § 299.430a (Supp. 1991). The Michigan legislation is

---

*I am baffled by the Court's suggestion that this case might be characterized as one in which garbage is being bought and sold. See *ante*, at 359. There is no suggestion that petitioner is making payment in order to have garbage delivered to it. Petitioner is, instead, being paid to accept the garbage of which others wish to be rid. There can be little doubt that in accepting this garbage, petitioner is also imposing environmental and other risks attendant to the waste's delivery and storage.

thus quite unlike the simple outright ban that we confronted in *Philadelphia.*

In adopting this legislation, the Michigan Legislature also appears to have concluded that, like the State, counties should reap as they have sown—hardly a novel proposition. It has required counties within the State to be responsible for the waste created within the county. It has accomplished this by prohibiting waste facilities from accepting waste generated from outside the county, unless special permits are obtained. In the process, of course, this facially neutral restriction (*i. e.,* it applies equally to both interstate and intrastate waste) also works to ban disposal from out-of-state sources unless appropriate permits are procured. But I cannot agree that such a requirement, when imposed as one part of a comprehensive approach to regulating in this difficult field, is the stuff of which economic protectionism is made.

If anything, the challenged regulation seems likely to work to Michigan's economic disadvantage. This is because, by limiting potential disposal volumes for any particular site, various fixed costs will have to be recovered across smaller volumes, increasing disposal costs per unit for Michigan consumers. 56 Fed. Reg. 50987 (1991). The regulation also will require some Michigan counties—those that until now have been exporting their waste to other locations in the State—to confront environmental and other risks that they previously have avoided. Commerce Clause concerns are at their nadir when a state Act works in this fashion—raising prices for all the State's consumers, and working to the substantial disadvantage of other segments of the State's population—because in these circumstances "'a State's own political processes will serve as a check against unduly burdensome regulations.'" *Kassel* v. *Consolidated Freightways Corp. of Del.,* 450 U. S. 662, 675 (1981) (quoting *Raymond Motor Transportation, Inc.* v. *Rice,* 434 U. S. 429, 444, n. 18 (1978)). In sum, the law simply incorporates the com-

monsense notion that those responsible for a problem should be responsible for its solution *to the degree they are responsible for the problem but not further.* At a minimum, I think the facts just outlined suggest the State must be allowed to present evidence on the economic, environmental, and other effects of its legislation.

The Court suggests that our decisions in *Brimmer* v. *Rebman,* 138 U. S. 78 (1891), and *Dean Milk Co.* v. *Madison,* 340 U. S. 349 (1951), foreclose the possibility that a statute attacked on Commerce Clause grounds may be defended by pointing to the statute's effects on intrastate commerce. But our decisions in those cases did not rest on such a broad proposition. Instead, as the passages quoted by the Court make clear, in both *Brimmer* and *Dean Milk* the Court simply rejected the notion that there could be a noneconomic protectionist reason for the bans at issue, because the objects being banned presented no health or environmental risk. See *Brimmer,* 138 U. S., at 83 ("[i]f the object of Virginia had been to obstruct the bringing into that State, for uses as human food, of all beef, veal and mutton, *however wholesome*" (emphasis added)); see also *ibid.* (comparing the statute to one that bans meat from other States "in whatever form, and although *entirely sound and fit* for human food" (emphasis added)); *Dean Milk,* 340 U. S., at 354 (the statute "excludes from distribution in Madison *wholesome* milk" (emphasis added)). It seems unlikely that the waste here is "wholesome" or "entirely sound and fit." It appears, instead, to be potentially dangerous—at least the State has so concluded. Nor does the legislation appear to protect "a major local industry against competition from without the State." *Ibid.* Neither *Dean Milk* nor *Brimmer* prohibits a State from adopting health and safety regulations that are directed to legitimate local concerns. See *Maine* v. *Taylor,* 477 U. S. 131 (1986). I would remand this case to give the State an opportunity to show that this is such a regulation.

We confirmed in *Sporhase* v. *Nebraska ex rel. Douglas*, 458 U. S. 941 (1982), that a State's effort to adopt a comprehensive regime to address a major environmental threat or threat to natural resources need not run afoul of the Commerce Clause. In that case we noted that "[o]bviously, a State that imposes severe withdrawal and use restrictions on its own citizens is not discriminating against interstate commerce when it seeks to prevent the uncontrolled transfer of water out of the State." *Id.*, at 955–956. Substitute "attractive and safe environment" for "water" and one has the present case. Michigan has limited the ability of its own population to despoil the environment and to create health and safety risks by excessive and uncontrolled waste disposal. It does not thereby violate the Commerce Clause when it seeks to prevent this resource from being exported—the effect if Michigan is forced to accept foreign waste in its disposal facilities. Rather, the "resource has some indicia of a good publicly produced and owned in which a State may favor its own citizens in times of shortage." *Id.*, at 957. Of course the State may choose not to do this, and in fact, in this case Michigan does permit counties to decide on an individualized basis whether to accept out-of-county waste. But such a result is not constitutionally mandated.

The modern landfill is a technically complex engineering exercise that comes replete with liners, leachate collection systems, and highly regulated operating conditions. As a result, siting a modern landfill can now proceed largely independent of the landfill location's particular geological characteristics. See 56 Fed. Reg. 51009 (1991) (Environmental Protection Agency approved "composite liner system is designed to be protective in all locations, including poor locations"); *id.*, at 51004–51005 (outlining additional technical requirements for only those landfill sites (1) near airports, (2) on floodplains, (3) on wetlands, (4) on fault areas, (5) on seismic impact zones, or (6) on unstable areas). Given this, the laws of economics suggest that landfills will sprout in places

where land is cheapest and population densities least. See Alm, "Not in My Backyard:" Facing the Siting Question, 10 EPA J. 9 (1984) (noting the need for each county to accept a share of the overall waste stream equivalent to what it generates so that "less populated counties are protected against becoming the dumping ground of the entire region"). I see no reason in the Commerce Clause, however, that requires cheap-land States to become the waste repositories for their brethren, thereby suffering the many risks that such sites present.

The Court today penalizes the State of Michigan for what to all appearances are its good-faith efforts, in turn encouraging each State to ignore the waste problem in the hope that another will pick up the slack. The Court's approach fails to recognize that the latter option is one that is quite real and quite attractive for many States—and becomes even more so when the intermediate option of solving its own problems, but only its own problems, is eliminated.

For the foregoing reasons, I respectfully dissent.