**SOUTHERN STATES LANDFILL, INC., Plaintiff,**

v.

**GEORGIA DEPARTMENT OF NATURAL RESOURCES, et al., Defendants.**

**Civ.A. No. 91–269–3–MAC(WDO).**

United States District Court, M.D. Georgia, Macon Division.

Aug. 11, 1992.

William E. Hicks, Dublin, Ga. and Linwood Robert Lovett, Macon, Ga., for plaintiff.

Barbara H. Gallo and Alan Gantzhorn, Atlanta, Ga., for defendants.

## ORDER

OWENS, Chief Judge.

This case is the lead case in an action that has been partially consolidated with *Geowaste of Georgia, Inc. v. Tanner,* 92-60-VAL(WDO). The question before the court is whether the Georgia statutes and regulations that apply to out-of-state waste, or "special solid waste," are constitutionally valid under the dormant Commerce Clause. Both sides have moved for summary judgment.

## FACTS

The facts in this case are undisputed. Both plaintiffs in these partially consolidated cases are privately-owned landfills which seek to dispose of out-of-state waste. Southern States Landfill, Inc. ("Southern States"), plaintiff in *Southern States v. Georgia Dept. of Natural Resources,* 91-269-3-MAC(WDO), operates a landfill and a waste transfer station [1] in Taylor County, Georgia.

---

1. A waste transfer station is "a facility used to transfer solid waste from one transportation vehicle to another for transportation to a disposal facility or processing station." Rule 391-3-4-.01(55) of the Rules of Georgia Dept. of Natural Resources, Environmental Protection Division (1991). The Southern States transfer station allows waste to be transported to the landfill by rail. The waste is transferred at the station from train to trucks for actual delivery to the landfill.

Southern States received two solid waste handling permits to operate these facilities from the Environmental Protection Division of the Georgia Department of Natural Resources ("EPD") on February 10, 1989. The permits authorize Southern States to receive only "solid waste", or waste generated within the State of Georgia.

Southern States began operations on June 13, 1990. Since that time, it has entered into several contracts to receive waste for disposal from adjacent states. Southern States requested approval from the EPD for accepting out-of-state waste or "special solid waste" on April 11, 1991. The EPD denied approval because Southern States had not applied for a "special solid waste handling permit" as required in O.C.G.A. § 12–8–24(a). Southern States has not engaged in any out-of-state waste handling through the present date.

On August 23, 1991, Southern States filed this suit seeking a declaratory judgment that the statutes and regulations applying to special solid waste violate the dormant Commerce Clause of the United States Constitution. Southern States also seeks a permanent injunction enjoining the state from enforcing these statutes and regulations. [2]

Geowaste of Georgia, Inc. ("Geowaste"), plaintiff in *Geowaste of Georgia, Inc. v. Georgia Dept. of Natural Resources*, 92–60–VAL(WDO), operates a landfill in Lowndes County, Georgia. The landfill is located eighteen miles from the Florida border.

Geowaste's predecessor received a solid waste handling permit from the EPD on August 22, 1990. Under the permit, the operator is only authorized to receive in-state waste. The permit specifically provides that the landfill may not receive any "special solid waste" for disposal. The per-

mit was transferred to Geowaste on October 23, 1991.

Geowaste has several potential customers in Florida and other southeastern states; therefore, Geowaste sought specific approval from the EPD to receive "special solid waste" by letter dated September 23, 1991. The EPD denied this request on October 23, 1991, stating that Geowaste could not receive special solid waste without first obtaining a special solid waste handling permit.

On April 28, 1992, Geowaste filed this lawsuit challenging the constitutionality of the Georgia statutes and regulations that apply to "special solid waste". The *Geowaste* case was partially consolidated [3] with *Southern States* on May 13, 1992. After a hearing on the motions for summary judgment on June 11, 1992, the court granted a preliminary injunction against the enforcement of the statutes and regulations at issue.

## DISCUSSION

Plaintiffs in this case have moved for summary judgment on the constitutionality of the Georgia statutes and regulations that apply to the transport and disposal of out-of-state solid waste. Defendants have filed a cross-motion for summary judgment seeking a declaration that these laws are valid. There are no facts in dispute; therefore, a summary judgment decision is appropriate at this time.

Plaintiffs challenge the provisions of the Georgia Comprehensive Solid Waste Management Act, O.C.G.A. § 12–8–20 *et seq.* ("GCSWMA"), and Chapter 391–3–4 of the Rules of Georgia Department of Natural Resources, Environmental Protection Division ("EPD Rules"), that apply to the handling of "special solid waste," or out-of-state waste. They seek a declaratory judgment that all provisions and regulations

---

**2.** During the course of this litigation, the State of Georgia agreed to allow Southern States to amend its solid waste handling permit such that it could accept special solid waste for disposal. Thus, at this point in the litigation, Southern States is only challenging the fee provision of the special solid waste legislation.

**3.** In its lawsuit, Geowaste also challenges an ordinance passed by Lowndes County that regulates the importation of waste generated outside of Lowndes County into the county for disposal. The challenge to the Lowndes County ordinance has not been consolidated with the *Southern States* action.

that uniquely apply to special solid waste are invalid under the dormant Commerce Clause.

## I. The Georgia Comprehensive Solid Waste Management Act

The GCSWMA went into effect on March 30, 1990. The GCSWMA regulates the handling of all waste materials within the state of Georgia. The two types of waste materials of concern in this case are "solid waste" and "special solid waste." Under the GCSWMA, the term "solid waste"[4] encompasses all waste[5] generated *within* the State of Georgia except for certain types of waste such as "hazardous waste"[6] and "recovered materials"[7].

"Special solid waste" is defined as "any solid waste ... originating or produced from or by a source or generator not subject to regulation under Code Section 12–8–24." O.C.G.A. § 12–8–22(37). Section 12–8–24(j) provides that waste generators[8] located within the State of Georgia are subject to EPD inspection; consequently, "special solid waste" is really just another name for out-of-state waste.

The GCSWMA governs the handling[9] of all solid waste, and a person must comply with extensive regulations in order to engage in any type of waste handling within the state of Georgia. Furthermore, the GCSWMA expressly differentiates between in-state waste and out-of-state waste, and while the waste itself is treated in the same manner regardless of origin, one who handles out-of-state waste must comply with a set of administrative requirements not required for the handling of in-state waste.

### A. Requirements for In–State Solid Waste Handling

In order for a person to engage in the handling of in-state waste in Georgia, he must obtain a "solid waste handling permit" from the EPD. O.C.G.A. § 12–8–24(a). With this permit, one can engage in disposal of solid waste that was generated within the State of Georgia. The permit does not authorize one to engage in any out-of-state waste disposal, and it may be revoked if the holder violates any of the GCSWMA rules and regulations. O.C.G.A. § 12–8–24(e)(1). There is no preset time limit on the effectiveness of a solid waste handling permit.

---

4. "Solid waste" is defined in the GCSWMA as "any garbage or refuse; sludge from a wastewater treatment plant, water supply treatment plant, or air pollution control facility; and other discarded material including solid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations and community activities, but does not include recovered materials; solid or dissolved materials in domestic sewage; solid or dissolved materials in irrigation return flows or industrial discharges that are point sources subject to permit under 33 U.S.C. § 1342; or source, special nuclear, or by-product material as defined by the federal Atomic Energy Act of 1954 as amended (68 Stat. 923)." O.C.G.A. § 12–8–22(33).

5. A solid waste handling permit is required for "biomedical waste" as well; however, one must comply with many additional regulations to engage in handling biomedical waste. "Biomedical waste" is defined as "pathological waste, biological waste cultures and stocks of infectious agents and associated biologicals, contaminated animal carcasses (body parts, their bedding, and other wastes from such animals), sharps, chemotherapy waste, discarded medical equipment and parts, not including expendable supplies and materials which have not been

decontaminated, as further defined in Rule 391–3–4–.15 of the board, and other such waste materials." Neither plaintiff engages in biomedical waste disposal; therefore, these regulations are not at issue.

6. Certain types of solid waste have been designated "hazardous waste" by federal law. Appendix VIII to 40 C.F.R. Part 261. The state of Georgia also designates additional materials as "hazardous waste." O.C.G.A. § 12–8–62(2). Hazardous waste disposal is regulated by the Georgia Hazardous Waste Management Act, O.C.G.A. § 12–8–61 *et seq.*, and the Resource Conservation and Recovery Act of 1976, 42 U.S.C. § 6921 *et seq.*

7. "Recovered materials" are those materials which have been designated for recycling. O.C.G.A. § 12–8–22(25).

8. A "generator" is "any person in Georgia or in any other state who creates solid waste." O.C.G.A. § 12–8–22(11).

9. Solid waste handling is "the storage, collection, transportation, treatment, utilization, processing, or disposal of solid waste." O.C.G.A. § 12–8–22(34).

In obtaining a solid waste handling permit, one must complete a standard application form supplied by the EPD. With the permit application, the applicant must submit certification that it is not a "bad actor";[10] a statement that the applicant has the permission of the property owner to engage in solid waste handling; a list of the areas to be served by the facility; written verification of zoning compliance;[11] a site assessment;[12] and verification that the facility is consistent with local or regional solid waste management plans. Rule 391–3–4.02(6)–(10).

In addition, no one shall operate an in-state waste handling facility without demonstrating adequate financial responsibility[13] "to ensure the satisfactory maintenance, closure and postclosure care of such facility or to carry out any corrective action which may be required as a condition of a permit." O.C.G.A. § 12–8–27.

Moreover, an applicant must submit a written description of a plan to close the facility at any time during its operation. Rule 391–3–4–.11. Finally, once closure[14] has occurred, an operator of a solid waste handling facility must conduct postclosure[15] care for thirty years. Rule 391–3–4–.12(1). A copy of the postclosure plan must be submitted with the permit application as well. Rule 391–3–4–.12(5).

## B. Requirements for Out-of-State Solid Waste Handling

In order to engage in the handling of out-of-state waste within the State of Georgia, one must obtain a "special solid waste handling permit." O.C.G.A. § 12–8–24(a). An application for a special solid waste handling permit requires the same information as an application for a regular solid waste handling permit. For example, the applicant must show financial responsibility, zoning compliance, etc., and must submit plans for closure and postclosure.

However, one who wishes to engage in the handling of out-of-state waste must also comply with many regulations that are not required for in-state waste handling. First, out-of-state waste handlers must "de-

---

**10.** The applicant must submit a sworn statement that it:

  1. Has not intentionally misrepresented or concealed any material fact in the application submitted to the Director;

  2. Is not attempting to obtain the permit by misrepresentation or concealment;

  3. Has not been finally convicted in the State of Georgia or any federal court of any felony involving moral turpitude within three years immediately preceding the application for a permit;

  4. Has not been convicted of any violations of any environmental laws punishable as a felony in any state or federal court within five years preceding the application for a permit;

  5. Has not knowingly, willfully, and consistently violated the prohibitions specified in O.C.G.A. § 12–8–30.7; and

  6. Has not been adjudicated in contempt of any court order enforcing any federal environmental laws or any environmental laws of the State of Georgia within five years preceding the application for a permit.

**11.** Rule 391–3–4–.05(a) states as follows:

Zoning. The site must conform to all local zoning/land use ordinances. Written verification must be submitted to the Division by the applicant demonstrating that the proposed site complies with local zoning and land use ordinances, if any. This verification shall in-clude a letter from the local governmental authority stating that the proposed site complies with local zoning or land use ordinances, if any....

**12.** Rule 391–3–4–.05(1)(c)–(g) lists several criteria with which the site for a solid waste handling facility must comply.

**13.** A "financial responsibility mechanism" is "a mechanism designed to demonstrate that sufficient funds will be available to meet specific environmental protection needs of solid waste handling facilities. Available financial responsibility mechanisms include but are not limited to insurance, trust funds, surety bonds, letters of credit, personal bonds, certificates of deposit, financial tests, and corporate guarantees ..." O.C.G.A. § 12–8–22(10).

**14.** The term "closure" is defined as "a procedure approved by the division which provides for the cessation of waste receipt at a solid waste disposal site and for the securing of the site in preparation for postclosure." O.C.G.A. § 12–8–22(4).

**15.** "Postclosure" is "a procedure approved by the division to provide for long-term financial assurance, monitoring and maintenance of a solid waste disposal site to protect human health and the environment." O.C.G.A. § 12–8–22(23).

velop and implement a waste analysis plan capable of identifying representative samples of all waste received by the facility." O.C.G.A. § 12–8–27(a)(3).[16]

Second, all out-of-state waste transported within Georgia must be accompanied by a manifest. O.C.G.A. § 12–8–27(b). A "manifest" is a "form or document used for identifying the quantity and composition and the origin, routing, and destination of special solid waste during its transportation from the point of generation, through any intermediate points, to the point of disposal, treatment, or storage." There is neither a waste analysis plan nor manifest requirement for in-state waste.

Third, out-of-state waste handlers must pay a fee of ten dollars for every ton of out-of-state waste that they receive for disposal. O.C.G.A. § 12–8–27(c). The fee goes into the solid waste trust fund, which is to be used for corrective action at both in-state and out-of-state waste disposal facilities. O.C.G.A. § 12–8–27.1. Facilities that merely dispose of in-state waste do not pay any money into the fund.

Fourth, all generators, collectors, processors, transporters, and disposers of out-of-state waste are subject to random inspection by the EPD. Moreover, if the law of a jurisdiction in which one of these entities is located prohibits EPD inspection in that jurisdiction, then no out-of-state waste from that jurisdiction may be disposed in Georgia until the law is changed. O.C.G.A. § 12–8–27(d) & (e).

Finally, a special solid waste handling permit is only effective for up to ten years. Rule 391–3–4–.10(d)(2). In contrast, there is no time limit on the effectiveness of a solid waste handling permit.

Plaintiffs seek a declaratory judgment that all statutes and EPD rules that apply only to out-of-state waste are unconstitutional under the dormant Commerce Clause. The State seeks to uphold this legislation.

## II. Commerce Clause Analysis

Under the dormant Commerce Clause, the states may regulate certain types of interstate commerce as long as they stay within well-established limits. One of these limits is that a state cannot practice "economic protectionism," where a state attempts "to isolate itself from a problem common to many by erecting a barrier against the movement of interstate trade." *Philadelphia v. New Jersey*, 437 U.S. 617, 628, 98 S.Ct. 2531, 2538, 57 L.Ed.2d 475 (1978). Therefore, a state cannot discriminate "against articles of commerce coming from outside the State unless there is some reason, apart from their origin, to treat them differently." *Id.* at 626–27, 98 S.Ct. at 2532.

■ It is well established that the transport and disposal of out-of-state waste constitutes interstate commerce. *Id.* at 622. "Whether the business arrangements between out-of-state generators of waste and the [in-state] operator or a waste disposal site are viewed as 'sales' of garbage or 'purchases' of transportation and disposal services, the commercial transactions unquestionably have an interstate character." *Ft. Gratiot Sanitary. Landfill, Inc. v. Michigan Dept. of Natural Resources,* —— U.S. ——, ——, 112 S.Ct. 2019, 2023, 119 L.Ed.2d 139 (1992).

■ In a Commerce Clause challenge, the burden is initially on the plaintiff to show that the legislation is discriminatory against interstate commerce on its face or in its purpose and effect. *Hughes v. Oklahoma,* 441 U.S. 322, 336, 99 S.Ct. 1727,

---

**16.** A waste analysis plan is defined in the EPD Rules as follows:

[B]efore an owner or operator receives for processing, treatment, storage or disposal any special solid waste, he must obtain a detailed chemical and physical analysis of a representative sample of the waste, which analysis contains information which must be known to properly process, treat, store or dispose of the waste in accordance with these Regula-

tions. A representative sample of each load of special waste received must be inspected to determine whether it matches the identity of the waste specified on the accompanying manifest. The owner or operator must develop and follow a written waste analysis plan approved by the Division which describes the procedure which he will carry out to comply with this paragraph.

1736, 60 L.Ed.2d 250 (1979). Plaintiffs in this case have met their burden by showing that the provisions at issue are not only discriminatory on their face against the handling of out-of-state solid waste, but also in their purpose and effect.

■ The GCSWMA and the EPD Rules expressly differentiate between in-state waste and out-of-state waste, and many administrative burdens are placed upon the handling of out-of-state waste that are not placed upon the handling of in-state waste. Thus, the GCSWMA and the EPD Rules are facially discriminatory against out-of-state waste.

In addition, the evidence before the court indicates that the purpose behind the out-of-state waste legislation was to discriminate against out-of-state waste. During his deposition, the Director of the EPD made the following statements:

Q: Why was a distinction made between special solid waste and solid waste in the act?

A: We believed that special solid wastes, meaning wastes from out of state, needed to be treated somewhat differently than any other solid waste from in state. We were concerned at that time that there were a number of proposals being tendered around the state for entrepreneurs to establish landfills for the specific purpose of taking out-of-state waste into Georgia and disposing of it here.

. . . . .

Q: What would lead you to believe then that an operation in Georgia that took waste outside of the state would be able to take anything other than low quantity generator hazardous waste?

A: I have seen a lot of crooks in my life, and the proposals we were hearing were to take waste from the northeastern part of the United States, and we have had people who appear to me to be very shady individuals proposing to bring waste down here from Philadelphia and from New York and so on, and you know, if there is so much money that somebody can afford to bring waste hundreds of miles to dispose of it here, then I just assume that something is not right somewhere.

. . . . .

Q: ... [What] is the basis of your understanding that the out-of-state generators of hazardous waste are more likely to transport it to solid waste handling facilities in Georgia and result in a contamination of the natural resources of the state of Georgia as opposed to Georgia generators of hazardous waste ...?

A: The basis is that I trust people in Georgia a lot more than I trust people outside of Georgia who are generating and managing waste.

. . . . .

Q: Why would you [inspect waste generators] for special solid waste and not for solid waste?

A: Because we have a lot less trust of waste managers and waste handlers and generators who are out of state than we do for those in state.

Deposition of Harold F. Reheis, pp. 11, 15, 52, 54.

These responses indicate that the purpose of the GCSWMA and the EPD Rules was to discriminate against waste generators located outside the State of Georgia.

Finally, plaintiffs have shown that the regulations for out-of-state waste have a discriminatory effect on out-of-state waste handling. First, the ten-dollar per-ton fee makes out-of-state waste handling economically infeasible. The average tipping fee required by a landfill for waste disposal ranges from $20 to $25 per ton. If a landfill were forced to charge its customers an additional $10 per ton, it would not be able continue doing business with those customers.

Second, the additional permit, waste analysis plan, manifest, and inspection requirements are extremely burdensome and expensive, and these requirements discourage landfill operators from attempting to engage in out-of-state waste disposal. In fact, despite the large number of landfills operating in the state of Georgia, no Georgia landfill has obtained a permit to engage

in out-of-state waste handling.[17] This evidence is sufficient to show that the GCSWMA and EPD Rules have a discriminatory effect on out-of-state waste handling.

Because plaintiffs have met their burden to show that the GCSWMA and EPD Rules applying to out-of-state waste are facially discriminatory, the burden now falls upon the State to justify this discrimination. The State must "justify it both in terms of the local benefits flowing from the statute and the unavailability of nondiscriminatory alternatives adequate to preserve the local interests at stake." *Hughes v. Oklahoma*, 441 U.S. 322, 336, 99 S.Ct. 1727, 1736, 60 L.Ed.2d 250 (1979) (quoting *Hunt v. Washington Apple Advertising Comm'n*, 432 U.S. 333, 353, 97 S.Ct. 2434, 2446, 53 L.Ed.2d 383 (1977)). This justification is subject to the strictest scrutiny. *Id.* at 337, 97 S.Ct. at 1737.

In two cases decided on June 1, 1992, the Supreme Court applied strict scrutiny to Michigan and Alabama laws that facially discriminated against out-of-state waste. *Chemical Waste Management, Inc. v. Hunt*, — U.S. —, 112 S.Ct. 2009, 119 L.Ed.2d 121 (1992); *Ft. Gratiot Sanitary Landfill, Inc. v. Michigan Dept. of Natural Resources*, — U.S. —, 112 S.Ct. 2019, 119 L.Ed.2d 139 (1992). In these two cases, the Court found that the State failed to meet its burden under strict scrutiny to justify the discrimination; therefore, the laws were invalid under the Commerce Clause. Because these recent decisions have a direct impact upon this case, a brief discussion of them will be helpful.

In *Chemical Waste*, an operator of a hazardous waste facility challenged an Alabama law that imposed a per-ton-fee upon all out-of-state hazardous waste that was imported for disposal in Alabama. The Court found that the imposition of the fee facially discriminated against out-of-waste and that it had the effect of discouraging the full operation of appellant's facility. Therefore, the burden fell upon Alabama to

justify the fee by showing that it served a legitimate interest and that no nondiscriminatory alternatives were available. *Chemical Waste*, — U.S. at — 112 S.Ct. at 2014.

The Court found that Alabama had legitimate local purposes for the fee: (1) protection of the health and safety of citizens; (2) conservation of environment and natural resources; (3) compensation from out-of-state waste generators for the costs of disposing of their waste in Alabama; and (4) reduction of the flow of waste on state highways. *Id.* — U.S. at —, 112 S.Ct. at 2014. However, the state failed to show why only out-of-state waste was targeted to meet these goals. There was no evidence "that waste generated outside Alabama is more dangerous than waste generated in Alabama." *Id.* — U.S. at —, 112 S.Ct. at 2015.

Furthermore, the Court found that Alabama's primary concern in enacting the fee was for the volume of hazardous waste being disposed of in the hazardous waste facility, and that less discriminatory alternative means were available to alleviate this concern. For example, the state could have imposed a per-ton fee on all hazardous waste that is disposed in Alabama or placed a cap on the total amount of all hazardous waste disposed at the facility. Therefore, the per-ton fee on out-of-state hazardous waste was invalid under the Commerce Clause. *Id.* — U.S. at —, 112 S.Ct. at 2017.

Likewise, in *Ft. Gratiot Sanitary Landfill, Inc. v. Michigan Dept. of Natural Resources*, — U.S. —, 112 S.Ct. 2019, 119 L.Ed.2d 139 (1992), the Court invalidated a Michigan law that authorized counties to prohibit waste generated outside of a county from being disposed of in that county. The Court found that Michigan could not show any reason, apart from the origin of the waste, why out-of-county waste should be treated differently from in-coun-

---

**17.** Defendants point out that two solid waste handling facilities in Georgia do hold special solid waste handling permits. However, both of these facilities are incinerators for biomedical waste. The average charge for incineration of biomedical waste is $240 per ton. The $10–per–ton fee would have a minimal impact on this type of waste disposal.

ty waste. *Id.* —— U.S. at ——, 112 S.Ct. at 2024.

Furthermore, Michigan could attain its goal of helping counties plan for future waste disposal through less discriminatory means. For example, the State could have limited the total amount of waste a landfill could receive per year. Thus, there was "no valid health and safety reason for limiting the amount of waste that a landfill operator may accept from outside the State, but not the amount that the operator may accept from inside the State." *Id.* —— U.S. at ——, 112 S.Ct. at 2027. The legislation was an invalid restraint on interstate commerce.

Hence, in the case at bar, the court will follow these recent Supreme Court decisions and apply strict scrutiny to the provisions of the GCSWMA and the EPD Rules that regulate the handling of out-of-state waste. Unless the State can justify these provisions "both in terms of the local benefits flowing from [them] and the unavailability of nondiscriminatory alternatives adequate to preserve the local interests at stake," *Chemical Waste,* —— U.S. at ——, 112 S.Ct. at 2014 (quoting *Hunt v. Washington Apple Advertising Comm'n,* 432 U.S. 333, 353, 97 S.Ct. 2434, 2446, 53 L.Ed.2d 383 (1977)), these provisions are invalid under the Commerce Clause.

### III. The State's Justification for the Discrimination

The State first contends that although a bag of waste from Georgia is no different from a bag of waste from another state, there is a basis, apart from origin, to discriminate against out-of-state waste. It claims that waste imported from outside Georgia is more likely to contain hazardous waste and other prohibited substances [18] than in-state waste. This contention is based upon the fact that Georgia EPD inspectors have no authority to inspect waste generators outside the State; therefore, the EPD cannot adequately monitor the contents of out-of-state waste from its

point of origin to its point of disposal. The State claims that the additional permit, waste analysis plan, and other requirements for out-of-state waste are necessary to insure that prohibited waste does not enter Georgia landfills and cause great environmental damage.

The State bases its argument upon *Maine v. Taylor,* 477 U.S. 131, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986), in which the Supreme Court upheld a law in which the State of Maine banned the importation of out-of-state baitfish into the state. The Court applied strict scrutiny, but found that the ban served a legitimate purpose and that there were no less discriminatory means available. *Id.* at 151, 106 S.Ct. at 2454.

The State of Maine showed that allowing the import of live baitfish from other states placed Maine's baitfish at risk for two reasons. First, three types of parasites were prevalent in out-of-state baitfish, but these parasites were not common to Maine baitfish. Second, any non-native species accidently commingled with shipments of baitfish "could disturb Maine's aquatic ecology to an unpredictable extent." *Id.* at 141, 106 S.Ct. at 2448. Thus, the State of Maine had a legitimate reason, apart from origin, to discriminate against out-of-state baitfish.

In addition, Maine showed that it was nearly impossible to inspect baitfish shipments for parasites and commingled species. Thus, there were no alternative means available to protect the Maine baitfish supply. The State met its burden under strict scrutiny, and the ban was valid under the Commerce Clause. *Id.* at 151–52, 106 S.Ct. at 2454.

The case at bar is completely distinguishable from *Maine v. Taylor.* First, in *Maine,* the State provided scientific evidence that out-of-state baitfish posed an actual threat to in-state baitfish. *Id.* at 141–42, 106 S.Ct. at 2449. In contrast, in the case at bar, the State has produced no evidence that out-of-state waste contains more hazardous materials than in-state

---

**18.** The Georgia Code expressly prohibits the disposal of lead acid vehicle batteries in solid waste handling facilities. O.C.G.A. § 12–8–28.

Other types of waste, such as biomedical waste, must be specially treated before disposal in a landfill. Rule 391–3–4–.15(6)(a).

waste. The State's position is based upon pure speculation that out-of-state generators are likely to break the law. Hence, there is nothing before the court to show that out-of-state waste is more dangerous than in-state waste.

Furthermore, the State's scheme does not succeed in serving a legitimate local concern. The State's primary goal is to prevent the disposal of hazardous waste and other prohibited substances in Georgia landfills. The State expects to achieve this goal by closely tracking out-of-state waste from its point of origin to its point of disposal. However, there are no similar tracking requirements for in-state waste, and the State admits that in-state waste is not monitored from its point of origin to point of disposal. Thus, while the out-of-state regulations may succeed in preventing the disposal of prohibited substances that are commingled with out-of-state waste, the regulations provide no protection from prohibited substances being commingled with in-state waste. In order to better succeed in protecting Georgia landfills from prohibited wastes, the State should use the less discriminatory means of regulating all waste so strictly. *See Chemical Waste,* —— U.S. at ——, 112 S.Ct. at 2015.

The State apparently counters this discrepancy through its claim that in-state waste does not require close monitoring because Georgia waste generators are more likely to follow the GCSWMA and EPD Rules than out-of-state generators. This is because Georgia waste generators are more "trustworthy" than those from outside the state. This protectionist attitude does not support a valid Commerce Clause claim.

Thus, the State's attempt to justify its discrimination against out-of-state waste by claiming that out-of-state waste is distinguishable from in-state waste fails. That out-of-state generators may be less trustworthy than in-state generators is an insufficient reason to burden interstate commerce in solid waste disposal. A load of in-state waste is no different from a load of out-of-state waste apart from origin.

However, in addition to its general attempt to justify the entire out-of-state waste regulation scheme, the State has provided reasons to justify each regulation of out-of-state waste. The court will address each of these provisions.

### 1. *The Special Solid Waste Permit* [19]

██ The GCSWMA requires a person who wishes to engage in out-of-state waste disposal to acquire a special permit. This permit is in addition to the permit required to engage in in-state waste disposal, and, unlike the regular solid waste permit, the out-of-state waste permit is effective for ten years or less.

The State contends that the special permit requirement is necessary because it needs to identify those facilities which engage in out-of-state waste disposal, and identification is necessary because these facilities are likely to require greater scrutiny by the EPD. However, this contention is still based upon the State's assumption that out-of-state waste is more dangerous that in-state waste, and this assumption does not stand. Therefore, the State's justification for the special solid handling waste permit is insufficient.

Nonetheless, even assuming that out-of-state waste handlers do require greater scrutiny than in-state handlers, other less discriminatory means are available. The State could simply require a landfill to provide notice when the landfill intends to engage in out-of-state waste disposal. To require an additional *permit,* which contains exactly the same information as that needed to obtain an in-state waste permit, is duplicative and burdensome on someone who wishes to engage in out-of-state waste handling. Therefore, the requirement in O.C.G.A. § 12–8–24(a) and Rule 391–3–4–.02 that one must obtain a special solid waste handling permit prior to engaging in

---

**19.** The court notes that plaintiffs apparently seek invalidation of the *definition* of "special solid waste" in O.C.G.A. § 12–8–22(37). However-

er, a mere definition has no effect on interstate commerce; therefore, the court will not invalidate this legislation.

out-of-state waste disposal is unconstitutional under the Commerce Clause.

## 2. The Waste Analysis Plan

■ The GCSWMA requires an out-of-state waste handler to submit a waste analysis plan. O.C.G.A. § 12–8–27(a)(3), Rule 391–3–4–.10(1)(c). Through this plan, the operator must obtain a representative sample from *every* load of out-of-state waste received and perform a detailed chemical and physical analysis on the sample.

The purpose of the waste analysis plan requirement is to provide the State with assurance that out-of-state waste is being handled properly under the GCSWMA. While this requirement does serve to prevent disposal of some prohibited waste materials in Georgia landfills, it fails to overcome strict scrutiny.

There is no similar requirement for loads of in-state waste; thus, the State has no assurance that in-state waste is being handled properly. Prohibited waste materials could easily be commingled with loads of in-state waste; thus, the waste analysis plan requirement does not serve its intended purpose. The State may "trust" its in-state waste generators and transporters not to attempt to violate the GCSWMA; however, this "trust" is insufficient to justify the targeting of out-of-state waste in this manner. Hence, the waste analysis plan requirement is invalid under the Commerce Clause.

## 3. The Manifest Requirement

■ In addition, the GCSWMA requires out-of-state waste to be accompanied by a manifest at all times that the waste is in the State of Georgia. O.C.G.A. § 12–8–27)(b), Rule 391–3–4–.10(1)(d). The purpose of the manifest is to provide the State with information concerning the quantity and composition of solid waste entering the state and its point of origin and disposition. This information is to aid in planning for the future disposal of solid waste.

Again, the State fails to justify this requirement under strict scrutiny analysis. While the purpose of trying to obtain information necessary for the planning of future waste disposal is legitimate, the manifest requirement fails to serve this purpose adequately.

Through the manifest requirement, the State is able to determine the generator of the waste, the composition of the waste, the quantity of the waste, the transporter(s) of the waste, and the disposer(s) of the waste. Undoubtedly, this is useful information; however, the State has failed to show why it is only useful for out-of-state waste. Since there is no distinction between out-of-state waste and in-state waste, apart from origin, this type of information on *all* waste would be necessary to plan for future solid waste disposal effectively. Therefore, the State has failed to justify its requirement for a manifest only for out-of-state waste, and consequently, this requirement is constitutionally invalid.

## 4. The Fee Requirement

The State apparently concedes that the $10–per–ton fee on out-of-state waste is unconstitutional based upon the recent Supreme Court decision, *Chemical Waste Management Inc. v. Hunt,* —— U.S. ——, 112 S.Ct. 2009, 119 L.Ed.2d 121 (1992). In *Chemical Waste,* the Supreme Court held an analogous per-ton fee placed on the disposal of out-of-state hazardous waste in Alabama unconstitutional under the Commerce Clause. There is no real distinction between the out-of-state waste fee under the GCSWMA and the Alabama out-of-state hazardous waste fee invalidated by the Supreme Court; therefore, the $10 per-ton fee on out-of-state waste under the GCSWMA is unconstitutional.

## 5. Inspection of Out–of–State Waste Generators

■ The GCSWMA also requires that the EPD be authorized to inspect at random any out-of-state generators that dispose of their waste in Georgia. Without this authorization, the out-of-state generators are prohibited from disposing of waste in Georgia. Moreover, if an out-of-state generator is located within a jurisdiction which has a law that prohibits inspection by the Georgia EPD, that generator cannot

import waste into Georgia until the law of its jurisdiction is changed.

While inspection at the origin of the waste would be effective in preventing the commingling of prohibited waste with acceptable waste in some cases; the State has failed to show why inspection of out-of-state waste *after* it enters the State of Georgia would be ineffective to accomplish this goal. Furthermore, Georgia law requires anyone who handles waste within the State of Georgia to comply with the GCSWMA and the EPD Rules, and a person is heavily penalized for any violation.

For example, under O.C.G.A. § 12–8–30.-6(a), a Georgia private entity that violates any provision of the GCSWMA is civilly liable for up to $25,000 per day that the violation occurs. Moreover, *any* person (or organization) who knowingly violates the GCSWMA is subject to criminal sanctions. O.C.G.A. § 23–8–30.8. The State has provided no evidence that these mechanisms of enforcement, while apparently adequate for policing those who handle in-state waste, are inadequate for effectively policing those who handle out-of-state waste.

In addition, the State admits that it does not even routinely inspect in-state generators; therefore, the State is again seeking to regulate out-of-state waste through a practice which the State does not require for in-state waste. If the GCSWMA is adequate to insure compliance by in-state generators without routine inspections of their facilities, then there is no need to require inspections of the facilities of out-of-state generators. Thus, the inspection requirement is invalid under the Commerce Clause.

## CONCLUSION

The State's concern for the composition of waste in its landfills is a legitimate one; however, its statutory scheme for the regulation of out-of-state waste, as a whole, fails to overcome strict scrutiny under the Commerce Clause. While the State contends that it is necessary to monitor waste coming from outside of the state very strictly because outsiders are not familiar with the Georgia waste requirements and because they are not as "trustworthy" as Georgia citizens, the State has failed to show any reason, apart from origin, for distinguishing between in-state and out-of-state waste. Through its regulation of out-of-state waste, the State "has overtly moved to slow or freeze the flow of commerce for protectionist reasons." *Philadelphia v. New Jersey*, 437 U.S. 617, 628, 98 S.Ct. 2531, 2537, 57 L.Ed.2d 475 (1978).

In addition, the State has failed to show that a legitimate local purpose is served by the individual provisions of the GCSWMA and the EPD Rules that apply to out-of-state waste and that nondiscriminatory means are unavailable to achieve the same purpose. Therefore, the State has failed to justify its discrimination against out-of-state waste, and this discrimination is an unlawful interference with one's right to engage in interstate commerce in the transport and disposal of solid waste.

Accordingly, summary judgment in favor of plaintiffs is GRANTED. The provisions of the Georgia Comprehensive Solid Waste Management Act and the EPD Rules that apply to the regulation of "special solid waste," specifically O.C.G.A. § 12–8–27 and Rule 391–3–4–.10, in their entirety, and O.C.G.A. § 12–8–24 and Rule 391–3–4–.02, in so far as they require a permit for the handling of special solid waste, are DECLARED unconstitutional burdens upon interstate commerce. The State of Georgia is ENJOINED from all future enforcement of these provisions.

SO ORDERED.