OPINION
Ecological Systems, Inc. is appealing the judgment of the Montgomery County Court of Common Pleas, finding that Ecological Systems, Inc.'s wastewater is hauled waste and that the Dayton municipal ordinance prohibiting waste from outside the city does not violate the Ohio Constitution. The City of Dayton is cross-appealing the judgment finding that the Dayton municipal ordinance violates the Commerce Clause of the U.S. Constitution.
The City of Dayton maintains a publicly owned treatment works (hereinafter "POTW") for the processing of solid and liquid wastes within the Dayton service area pursuant to existing state and federal legislation. Dayton has additionally enacted a sewer use ordinance which governs the use of the POTW.
In 1998, Ecological Systems, Inc. (hereinafter "ESI") purchased a wastewater treatment plant in the Dayton area. The plant had previously been owned by General Motors, who had utilized the plant to process wastewater from its manufacturing plants. ESI planned on operating this plant by hauling contaminated wastewater from other industrial users within Ohio and the surrounding states to the Dayton facility. Then, ESI would remove the waste oil and oily substances to sell to its customers and then treat the remaining wastewater. ESI would hold the treated wastewater in large tanks and test it to ensure conformance with any chemical limitations set by Dayton's POTW. ESI would then deposit the remaining wastewater into an underground pipe that leads directly to the Dayton POTW. No dispute exists between the parties that ESI's proposed treated wastewater would meet the chemical limitations set by the Dayton POTW. Under ESI's proposed plan it would deposit between 1.2 and 10 million gallons of wastewater per week into the Dayton POTW. Due to the high amounts of waste ESI wished to discharge, ESI is classified as a "significant industrial user" under federal and state law and was required to obtain a permit to discharge into the City of Dayton`s sewer system and POTW.
Since 1997, ESI has applied three times for an industrial wastewater service and/or discharge permit application. All three times, Dayton has denied the application pursuant to the terms and conditions of the Dayton sewer ordinance. Dayton based its denial of the application on the following two sections of the sewer ordinance:
 3. Industrial and/or commercial wastes, and by-products and other materials originating from industrial and/or commercial operations outside the City of Dayton and the City of Dayton contract service areas shall not be discharged in any form into the wastewater facilities or storm sewer. Written exceptions to this provision may be made by the Director.
 4. No person shall access the wastewater facilities for any activity including discharge of hauled septic, industrial, or other wastes except at locations and at times as designated by the Director. * * *
(R.C.G.O. 52.06(B)(3)(4)). After the denial of ESI's third application, ESI filed a complaint seeking declaratory relief on March 10, 2000, alleging that Dayton's application of its sewer use ordinance was unconstitutional and that ESI's proposed wastewater discharge did not constitute "hauled waste."
This action was referred to a magistrate judge for a hearing and decision. The magistrate issued a decision in favor of ESI and concluded that: (1) the application of Dayton's sewer use ordinance prohibiting discharge of wastes originating outside of Dayton did not violate the Ohio Constitution, (2) Dayton could not deny a permit based on the sewer use ordinance prohibiting the discharge of wastes originating outside of Dayton because it violated the dormant Commerce Clause of the U.S. Constitution[1], and (3) Dayton could not deny a discharge permit based on its ordinance prohibiting "hauled waste" because ESI would not be discharging "hauled waste." Both ESI and Dayton filed objections to the magistrate's decision. The trial court upheld Dayton's denial of ESI's request for a permit. The trial court agreed with the magistrate that the ordinance prohibiting the discharge of wastes originating outside of Dayton did not violate the Ohio Constitution but did violate the dormant Commerce Clause of the U.S. Constitution. However, the trial court disagreed and reversed the magistrate on the third issue, finding that ESI's proposed treated wastewater is "hauled waste" subject to Dayton's sewer use exclusion. ESI and Dayton both filed timely notices of appeal.
ESI raises the following assignments of error:
 1. THE TRIAL COURT ERRED IN CONCLUDING THAT ECOLOGICAL SYSTEM INC.'S PROPOSED TREATED WASTEWATER DISCHARGE INTO A PIPE WHICH FLOWED DIRECTLY TO DAYTON'S PUBLICALLY-OWNED TREATMENT WORKS WAS "HAULED WASTE" SUBJECT TO DAYTON'S SEWER USE ORDINANCE EXCLUSION.
 2. THE TRIAL COURT ERRED BY FAILING TO CONCLUDE THAT DAYTON'S ORDINANCES, PROHIBITING THE DISCHARGE OF WASTES OUTSIDE OF DAYTON (AN ACTIVITY PERMITTED UNDER OHIO LAW), VIOLATED ARTICLE XVIII, SECTION 3 OF THE OHIO CONSTITUTION.
Dayton raises the following assignment of error in its cross appeal:
 1. THE TRIAL COURT ERRED IN FINDING THAT DAYTON'S SEWER USE ORDINANCE VIOLATED THE COMMERCE CLAUSE OF THE UNITED STATES CONSTITUTION.
Generally, when reviewing a trial court's rejection of a magistrate's decision, an appellate court reviews whether the trial court abused its discretion. Wade v. Wade (1996), 113 Ohio App.3d 414, 419. However, when an appellate court reviews a trial court's decision in a declaratory action in which the facts are undisputed, all that remains is a question of law. As such, the appellate court should utilize a plenary standard of review. Lewis v. Motorists Insurance Cos. (1994), 96 Ohio App.3d 575 . In the instant action, no questions of fact remain and therefore, we will conduct a plenary standard of review of the three assignments of error.
Appellant's first assignment of error:
ESI argues that the trial court erred in concluding that the wastewater it seeks to discharge into Dayton's POTW is excluded by the sewer ordinance exception for "hauled waste." We agree.
Dayton argues that the wastewater which ESI wishes to discharge into the POTW is hauled waste because the waste is hauled to ESI from various unknown locations and after treatment is still waste when ESI would discharge it to the POTW. However, ESI argues to conclude that any waste that is ever hauled is "hauled waste" is too broad a determination and rather that only waste which is hauled by truck or rail directly to the POTW can be considered "hauled waste" and banned from the POTW.
In its decision, the magistrate stated:
 Ample support for ESI's position exists on this issue. By looking at the terms "hauled waste," one is strained to come to the conclusion that the wastewater ESI wishes to discharge into the POTW fits the definition. Indeed, waste is hauled or otherwise transported to ESI's Webster Street facility, but it is hauled or transported there for treatment, not for discharge. The waste can hardly be considered to be the same as it was coming into the facility as it is coming out. To hold that "hauled waste" encompasses any waste that has been hauled at any time would be to exclude practically any waste that does not originate in the POTW from discharge privileges. To get to the POTW, waste needs to be transported in some way unless a direct pipeline exists for the waste to travel.
 The purpose of the ordinance section is more than likely to prevent untreated waste or waste that has an unknown origin from entering and contaminating the POTW. ESI's wastewater does not raise either of these concerns. The wastewater will be treated at the Webster Street facility and some evidence would even seem to suggest that the water, after treatment, is actually safer than most wastewater. The origin of the waste is easily ascertainable. More than likely, the intent of the enacting legislator was to prevent waste from being discharged directly into the POTW, and not to prevent waste that has been treated at a treatment facility from being discharged.
Further, 55 Fed. Reg. 30082, which undoubtedly has served as a guiding light for municipalities, expressly stated, "[w]astes discharged from a truck to the collection system at an industrial user['s] facility are not covered by today's prohibition, since such waste would not normally differ from that discharged by the facility during its usual operations." Here, the waste ESI wishes to discharge into the POTW is being transported from a truck into their collection system and treated. It is not dumping the waste directly into the POTW from the industrial users' truck. After all, ESI is in the business of treating wastewater, and not in the business of hauling untreated waste to POTWs. Thus, ESI's treated wastewater is not hauled waste.
We find the magistrate's opinion to be well developed and agree. Therefore, we adopt the magistrate's opinion on this issue as our own. However, we would clarify that this definition of "hauled waste" applies only for this municipal ordinance and does not define the term as used in state or federal law. Therefore, we find that the trial court's judgment on this issue was erroneous and this assignment of error is sustained.
Appellant's second assignment of error:
ESI argues the trial court erred in failing to conclude that Dayton's ordinance prohibiting discharge from outside of the Dayton area violates the Ohio Constitution. We disagree.
ESI argues that Dayton is only permitted to regulate pretreatment standards and its ordinance operates outside of that boundary. As support for this argument ESI points to R.C. 6111.03(J)(5) and O.A.C. 3745-3-04, which specifically list the process for issuing a discharge permit and an enumeration of prohibited discharges. ESI argues that since neither of these statutes discusses a prohibition for wastewater originating outside of a service area, Dayton's ordinance imposing such a restriction conflicts with a general law of the state of Ohio and is unconstitutional.
In his opinion, the magistrate stated:
 The Ohio Constitution expressly provides municipalities with the authority to "exercise all powers of local self government and to adopt and enforce within their limits such local police, sanitary and other similar regulation, as are not in conflict with general laws." Ohio Const., Art. XVIII, § 3. General laws are laws "operating uniformly throughout the state[,] which prescribe a rule of conduct upon citizens generally, and which operate with general uniform application throughout the state under the same circumstances and conditions." Sheffield v. Rowland (1999), 87 Ohio St.3d 9. To determine if a conflict exists between a general law and a local ordinance, a court must look to see if the local ordinance permits or forbids what a general law forbids or permits. Sheffield, 87 Ohio St.3d at 11. When reviewing an ordinance under a constitutional challenge, it is well established that such ordinances enjoy a presumption of constitutionality and a court must, if at all possible, construe the ordinance in a light most favorable to the enacting legislative body. [State] v. Dorso (1983), 4 Ohio St.3d 60, 61.
Though O.A.C. 3745 enumerates certain prohibited discharges and R.C. 6111 provides general guidance for assessing whether to grant a discharge permit, R.C. 6111 goes on to provide municipalities with an express grant of discretion when enacting local ordinances in this area. As the City of Dayton properly points out, R.C. 6111.032 provides, in part:
 (A) The legislative authority of a municipal corporation . . . Shall exercise primary authority to adopt, amend, rescind, administer and enforce rules with respect to all of the following
* * *
 [4] The establishment, operation, administration, and enforcement of its publicly owned treatment works pretreatment program, including inspection, monitoring, and reporting programs and activities.
R.C. 6111.032(A)(4).
This legislative grant of authority is a recognition, on the part of the General Assembly, that municipalities are to be given flexibility and primary authority in developing ordinances within their borders. Thus, unless one reads R.C. 6111 to be in internal conflict, a hypothetical that is forbade with the presumptions of constitutionality and with the canons of construction that are utilized here, there can be no conflict between the City of Dayton's ordinance and the general laws found in Ohio. In addition, the proposition that just because neither R.C. 6111 nor O.A.C. 3745 provide that out of services charges are prohibited, the City of Dayton is precluded from making such discharges prohibited acts in direct contradiction to the broader authority granted to municipalities by R.C. 6111.032. It would be nothing short of dangerous to maintain that municipalities were forbidden from regulating something just because a general law provides a list of things it thinks, at the time, will provide a guide to municipalities, especially given the broader grant of discretion found in the same statutory chapter.
We agree with the magistrate and adopt his opinion on this issue as our own. The judgment of the trial court on the issue of whether the ordinance violates the Ohio Constitution is affirmed. ESI's second assignment of error is without merit and overruled.
Cross-Appellant's assignment of error:
Dayton argues that the trial court erred in concluding that Dayton's ordinance violated the dormant Commerce Clause of the U.S. Constitution. We disagree.
The magistrate noted the following in his opinion:
 The Commerce Clause of the United States Constitution vests Congress with the power "[t]o regulate commerce with foreign nations, and among the several states, and with Indian tribes." U.S. Const., Art. I, § 8, cl. 3. Found within this constitutional ambit, the dormant Commerce Clause prohibits states from advancing their own commercial interests by curtailing the movement of articles of commerce either into or out of the state. H.P. Hood Sons, Inc. v. Du Mond (1949), 336 U.S. 525, 535. Because the ability of Congress to regulate every single item of interstate commerce is impractical, if not impossible, states are free to regulate items of "local character" so long as the exercise of this regulatory power is executed within the confines of the Commerce Clause itself. City of Philadelphia v. New Jersey (1978), 437 U.S. 617, 623; see also Waste Recycling, Inc. v. Southeast Alabama Solid Waste Disposal Authority (M.D.Ala. 1993), 814 F. Supp. 1566, 1571 (citing Dean Milk Co. v. City of Madison (1951), 340 U.S. 349, 353 for the proposition that the dormant Commerce Clause applies to municipal ordinances, too).
Though this restraint on state regulation of interstate commence is not to be found anywhere within the text of the Constitution, the Supreme Court, over time, has emanated the proper standards to be used when a challenge to state legislation is based on the dormant Commerce Clause.City of Philadelphia, 437 U.S. at 623-624. The standard to be used, however, depends upon whether or not the statute patently discriminates against interstate commerce or whether it is facially neutral with only an incidental effect on interstate commerce. Discrimination, in the context of the dormant Commerce Clause, can be defined as the "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the later." Oregon Waste Systems,Inc. v. Dep't of Environmental Quality of Oregon (1994), 511 U.S. 93, 99.
Where a state law, or one issued by one of its political subdivisions, patently discriminates against interstate commerce, it will be held unconstitutional "unless the discrimination is demonstrably justified by a valid factor unrelated to economic protectionism." Fort GrariotSanitary Landfill v. Michigan (1992), 504 U.S. 353, 359 (quoting NewEnergy Co. of Indiana v. Limbach (1988), 486 U.S. 269, 274). In short, state legislation that places a state in economic isolation from other states will create a "virtually per se rule of invalidity" under the Commerce Clause. Camps v. Newfound/Owatonna, Inc. v. Town of Harrison
(1997), 520 U.S. 564, 575; City of Philadelphia, 437 U.S. at 624; see also In re Southeast Arkansas Landfill, Inc. (8th Cir. 1992), 981 F.2d 372,375 (stating, "[parochial legislation designed to further the economic interests of a state's own citizens at the expense of those in other states is treated with great suspicion"). This "virtually per se" rule is applicable to all statutes embracing the theory of economic protectionism, "save for a narrow class of cases in which a municipality can demonstrate, under rigorous scrutiny, that it has no other means to advance the legitimate local interest." C A Carbone, Inc. v. Town ofClarkstown, NY (1994), 511 U.S. 383, 392. Regardless, most often, the only way to justify state or local statutes that patently discriminate against interstate commerce is to do so on health or safety grounds. SeeBFI Medical Waste Systems v. Whatcom County (9th Cir. 199[2]),983 F.2d 911, 913; Hazardous Waste Treatment Council v. South Carolina
(4th Cir. 1991), 945 F.2d 781, 790 (stating that Supreme Court acceptance of facial discrimination focuses on the presence of a threat of disease or death if the statute is struck down as unconstitutional).
Obviously, the scrutiny utilized in these cases is very difficult, if not impossible, to overcome. See Oregon Waste Systems, 511 U.S. at 101
(stating that "facial discrimination by itself may be a fatal defect");Healy v. Beer Institute, Inc. (1989), 491 U.S. 324, 337 n. 14 (stating, "[w]hen state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests, we [the Supreme Court] have generally struck down the [statute] without further inquiry"). The amount of interstate commerce affected by a state law only measures the extent of the discrimination, and has no bearing on whether the law has, in fact actually discriminated against interstate commerce and is thus, violative of the dormant Commerce Clause. Wyoming v. Oklahoma (1992), 502 U.S. 437,455.
The standard is a bit different when the state law does not patently discriminate against interstate commerce. City of Philadelphia,437 U.S. at 624. The Supreme Court, in Pike v. Bruce Church, Inc. (1970), enunciated the standard for these situations in the following manner:
 Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. . . If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.
 397 U.S. 137, 142.
As a preliminary matter, it must be noted that the wastewater at issue is an article of commerce subject to the strict scrutiny of the commerce clause. See Carbone, 511 U.S. at 391 (stating that dormant Commerce Clause applies to service industries); Fort Grariot, 504 U.S. at 359
(stating that solid waste, even if it has no value, is an article of commerce and stating also, "whether the business arrangements between out-of-state generators of waste and the Michigan operator of a waste disposal site are viewed as "sales" of garbage or "purchases" of transportation and disposal services, the commercial transactions unquestionably have an interstate character"); see also National SolidWastes Management Association v. Meyer ([C.A. 7,] 1995), 63 F.3d 652, 657
(determining that the dormant Commerce Clause applies "with full force to state regulation of the collection, transportation, processing, and disposal of solid waste"). The evidence indicated waste is received from [ESI's] customers in a 150 mile radius of Dayton. That necessarily would encompass parts of Indiana and Kentucky.
The City of Dayton argues that City of Philadelphia, its progeny, andPike do not apply to this case because those cases involved private landfill or waste disposal owners and the facility here is owned publicly by the City of Dayton. This argument is not persuasive. The City of Dayton has pointed to no legal authority, and the Magistrate has found none, to support its proposition. The focus in dormant Commerce Clause challenges in this context has been not on the individual benefactor of the statute at issue, but rather at the discriminatory effect, facial of otherwise, of the law itself. In addition, City of Philadelphia and Pike
have been widely considered to be the controlling law in all cases involving dormant Commerce Clause challenges to state or local statutes that regulate "the collection, transportation, processing, and disposal" of waste materials. See Meyer, 63 F.3d at 657.
Now it must be determined whether or not the ordinance at issue here patently discriminates against interstate commerce, thus bringing the case under the rigorous scrutiny mandated by City of Philadelphia, or whether the case need only be analyzed under the softer standard set forth inPike. The Magistrate concludes that the ordinance patently discriminates and must be analyzed under the jurisprudence of City of Philadelphia and its progeny. The ordinance provides for the following:
 Section 52.06 CONDITIONS TO USE THE CITY'S WASTEWATER SEWERS
* * *
B. PROHIBITED DISCHARGES
* * *
 3. Industrial and/or commercial wastes, and by-products and other materials originating from industrial and/or commercial operations outside the City of Dayton and the City of Dayton contract services areas shall not be discharged in any form into the wastewater facilities or storm sewer. Written exceptions to this provision may be made by the Director.
R.C.G.O. § 52.06(b)(3) [emphasis omitted]. This ordinance clearly and patently discriminates against interstate commerce. The ordinance completely prohibits any wastes, by-products or other materials that originate outside the city or the city's contract services areas. This, in effect, means that discharge of any materials from another state into the City of Dayton's wastewater facilities is prohibited. Even by simply making the distinction between wastes, products, and other materials that come from outside the city and those that originate inside the city evinces an intent to only accept those that come from outside the latter category. This kind of statutory language, in light of the expansive amount of authority noted above, can be held to be nothing else but patent discrimination against interstate commerce.
In order to escape the ordinance being struck down as violative of the dormant Commerce Clause, there fore, the City of Dayton must assert a non-economic justification that outweighs any burden imposed on interstate commerce. The City of Dayton has failed to assert, much less prove, such an interest exists. The City does contend that the ordinance it enacted was mandated by the Federal Water Pollution Control Act,33 U.S.C. § 1251, which was found to be constitutional. In addition, the City asserts that the Federal Water Pollution Control Act also mandates that ordinances enacted under its purview required the approval of the EPA, and such approval was obtained for the ordinance at issue.
This argument reaches a conclusion without the necessary, building block premises to support it. While it may be, in fact, true that the Federal Water Pollution Control Act, as a whole, was found to be constitutional, it does not automatically follow that a municipality's application of the constitutional ordinance was constitutional. Suppose further that a militant minded state decides that the best way to execute its delegated authority to make such a law would be to require police officers who suspect a person of endangering the safety of another human being to break into the suspect's home and utilize whatever evidence they may find against the person in a court of law. Obviously, application of such a law would run afoul of the Fourth Amendment, regardless of the fact that the Congressional organic statute has been found to be a constitutional delegation of power. In addition, simply because the EPA has voiced its approval of the ordinance does not foreclose a court's inquiry into the constitutionality of its application. Though entitled to a certain deferential weight, the EPA's determination is not dispositive and does not foreclose an affected party's ability to have the law interpreted by the judicial branch.
The City of Dayton has offered no evidence proving that the ordinance was enacted to address legitimate health concerns, and had offered no evidence that this ordinance was the only way to effectively protect a health concern. In short, the City of Dayton has not set forth any interest of local concern that justifies the ordinance's patent discrimination against interstate commerce under the strict scrutiny ofCity of Philadelphia and its progeny. This result is in accord with the vast wealth of case law invalidating statutes or ordinances that patently discriminate against interstate commerce. See e.g. BFI Medical WasteSystems, 983 F.2d 911, 913 (holding that out of county waste bans are per se unconstitutional and will be struck down as violative of the dormant commerce clause when a municipality offers no health or safety justification for the ordinance); In re Southeast Arkansas Landfill,Inc. (8th Cir. 1992) [981 F.2d at 375] (holding that state statutes limiting the amount of solid waste generated outside a state's regional planning district that could be accepted into landfills within the district were facially discriminatory against the interstate commerce and thus, without sufficient state justification, were unconstitutional);Environmental Waste Reductions, Inc. v. Reheis (N.D.Ga. 1994),887 F. Supp. 1534, 1568 (holding that any state statute that has the effect of requiring an applicant for a permit to operate a waste facility to segregate and handle differently waste from out-of-state, solely on the basis of the waste's geographic origin, would place a burden on interstate commerce that exceeds any local benefit).
The City of Dayton argues that the magistrate failed to consider the health concerns it raised. Specifically, that improperly treated wastes can directly affect, and possibly kill, the microorganisms responsible for the chemical treatment of solid wastes in the facility. (Tr. 141-143). Further improper waste discharges from ESI could physically harm and/or kill Dayton's employees who work within the POTW or contaminate the solid waste sludge in the POTW. (Tr. 137-143). Finally, certain types of contaminated wastes could cripple the POTW and force the Dayton POTW to discharge untreated waste into the Miami River which is Dayton's water supply. However, ESI has stated that it will meet all of the discharge requirements of the POTW and will therefore not be discharging improper waste. Additionally, Mr. Schommer, Dayton's Wastewater Treatment Division Manager testified as follows:
 [ESI's attorney] Isn't it true that the E.S.I. holding tank of — a six hundred thousand . . . gallon holding tank allows the City of Dayton to know exactly what's being discharged to the City of Dayton?
 Mr. Schommer: As I understand it, what E.S.I. has proposed is to use that as a storage tank and to sample that prior to discharge so that they're certain that it meets the affluent [sic] limitations. In that regard, in having faith in their testing abilities, I would say that they should meet our Permit standards based on what they've said.
Therefore, the Wastewater Treatment Division Manager was not concerned with improper discharges from ESI and potential health concerns arising therefrom. Thus, we agree with the magistrate that Dayton did not present any evidence that the ordinance was enacted to address legitimate health concerns, which this ordinance was the only means to protect. We find the magistrate's decision to be well developed on this issue and adopt it as our own. The City of Dayton's cross appeal is without merit and overruled.
The judgment of the trial court is affirmed in part, reversed in part, and remanded for further proceedings consistent with this court's opinion.
WOLFF, P.J. and BROGAN, J., concur.
[1] The "dormant" Commerce Clause is a judicially created doctrine of constitutional law that limits state interference with interstate commerce even in the absence of specific Congressional action. The Commerce Clause as found in the U.S. Constitution expressly grants Congress the power to regulate commerce among the states, but does not expressly limit the state's power to interfere with interstate commerce.Hood Sons v. Du Mond (1949), 336 U.S. 525, 535. However, this limitation has been found to exist in the negative implications of the clause since 1824. Gibbons v. Ogden (1824), 22 U.S. 1; see, also, Tribe, American Constitutional Law (2 Ed. 1988) 401-406, Sections 6-1 to 6-3.